J-A23031-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| HATTIE D. LOVETT, AS ADMINISTRATRIX FOR THE ESTATE OF: MCKINLEY C. LOVETT, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| HCR MANORCARE, INC., WALLINGFORD NURSING AND REHABILITATION CENTER-WALLINGFORD, PA, LLC, D/B/A MANORCARE HEALTH SERVICES-WALLINGFORD, HCR MANORCARE, LLC MANORCARE HEALTH SERVICES, INC. A/K/A MANORCARE HEALTH SERVICES, LLC, MANOR CARE, INC., HCR IV HEALTHCARE, LLC., HCR III HEALTHCARE, LLC, HCR II HEALTHCARE, LLC, HCR HEALTHCARE, LLC, HCRMC OPERATIONS, LLC, HCR MANORCARE OPERATIONS II, LLC, HEARTLAND EMPLOYMENT SERVICES, LLC, HCR MANORCARE HEARTLAND, LLC, HCR MANOR CARE SERVICES, LLC, CROZER-KEYSTONE HEALTH SYSTEM, AND PROSPECT CCMC, LLC D/B/A CROZER-CHESTER MEDICAL CENTER | No. 564 EDA 2020 |
| APPEAL OF: HCR MANORCARE, INC., WALLINGFORD NURSING AND REHABILITATION CENTER-WALLINGFORD, PA, LLC, D/B/A MANORCARE HEALTH SERVICES-WALLINGFORD, HCR MANORCARE, LLC MANORCARE HEALTH SERVICES, INC. A/K/A MANORCARE HEALTH SERVICES, LLC, MANOR CARE, INC., | |

HCR IV HEALTHCARE, LLC., HCR III : 
HEALTHCARE, LLC, HCR II : 
HEALTHCARE, LLC, HCR : 
HEALTHCARE, LLC, HCRMC : 
OPERATIONS, LLC, HCR MANORCARE : 
OPERATIONS II, LLC, HEARTLAND : 
EMPLOYMENT SERVICES, LLC, HCR : 
MANORCARE HEARTLAND, LLC, HCR : 
MANOR CARE SERVICES, LLC, : 
CROZER-KEYSTONE HEALTH SYSTEM : 
AND PROSPECT CCMC, LLC D/B/A/ 
CROZER-CHESTER MEDICAL 
CENTER,

Appeal from the Order Entered January 22, 2020
In the Court of Common Pleas of Delaware County Civil Division at
No(s): No. CV-2018-000407

BEFORE: KUNSELMAN, J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.: **FILED NOVEMBER 18, 2020**

ManorCare[1] appeals from the trial court order overruling its Preliminary

Objections to the Complaint of Hattie D. Lovett, as Administratrix for the

Estate of McKinley C. Lovett, Deceased (the Estate). The Preliminary

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] "ManorCare" is comprised of fourteen entities: HCR ManorCare, Inc.; Wallingford Nursing and Rehabilitation Center-Wallingford PA, LLC d/b/a ManorCare Health Services-Walllingford; HCR ManorCare, LLC; ManorCare Health Services, Inc. a/k/a ManorCare Health Services, LLC; Manor Care, Inc.; HCR IV Healthcare, LLC; HCR III Healthcare, LLC; HCR II Healthcare, LLC; HCR Healthcare, LLC; HCRMC Operations, LLC; HCR ManorCare Operations II, LLC; Heartland Employment Services, LLC; HCR ManorCare Heartland, LLC; and HCR Manor Care Services, LLC.

Objections sought to compel arbitration[2] pursuant to the Voluntary Arbitration Agreement (Agreement) signed by Hattie D. Lovett on behalf of her husband, McKinley C. Lovett. ManorCare argues that the trial court erred when it concluded that Hattie D. Lovett lacked authority to execute the Agreement on her late husband's behalf, and on this basis, declined to enforce its terms.

**I.**

We take the following factual background and procedural history from our review of the certified record and the trial court's April 7, 2020 opinion.

On February 8, 2016, eighty-two-year-old McKinley C. Lovett presented to Prospect CCMC, LLC. He had sustained a fall and was suffering from pressure ulcers, skin impairments and malnutrition. He was transferred to ManorCare on February 13, 2016. He resided there for twenty-one days until March 4, 2016, when he was discharged to the home he shared with his wife, Hattie D. Lovett, per their wishes. On March 4, 2016, the day of discharge, Hattie D. Lovett signed the admissions paperwork,[3] including the Agreement,

---

[2] This appeal is properly before this Court as an interlocutory appeal as of right. *See* 42 Pa.C.S. § 7320(a)(1); Pa.R.A.P. 311(a)(8); *Gaffer Ins. Co., Ltd. v. Discover Reinsurance Co.*, 936 A.2d 1109, 1110 n.2 (Pa. Super. 2007).

[3] The twenty-seven-page admissions packet contained over ten (10) separate documents requiring a signature. The forms included an admissions agreement between Patient and Center, a receipt of notice of information practices, a resident trust fund authorization, a skilled nursing facility denial letter, a Medicare secondary payee questionnaire, a ManorCare patient supplement, a transportation notice, supplemental primary care doctor notice,

- 3 -

on her husband's behalf. The Agreement provided, in pertinent part, that signing it was voluntary and not required for admission, that the resident was waiving his right to a jury trial, and all disputes were to be arbitrated. (**See** Voluntary Arbitration Agreement, 3/04/16, at 1, 3).

Mr. Lovett died on May 23, 2016. On January 17, 2018, the Estate filed a Complaint against ManorCare.[4] The Complaint alleged negligence, corporate negligence/liability and custodial neglect for failure to properly examine, treat and care for McKinley C. Lovett during his admission at ManorCare from February 13, 2016, through March 4, 2016. ManorCare filed Preliminary Objections on February 9, 2018, which moved, in pertinent part, to compel enforcement of the Agreement. (**See** Preliminary Objections, 2/09/18, at 7-9). On May 6, 2019, the trial court granted the parties leave to conduct discovery related to the execution of the Agreement and to file supplemental memoranda of law.

As part of this discovery, the parties conducted depositions of Hattie D. Lovett and Nicole Zimmerman, a ManorCare Business Development Specialist.

---

smoking and safety policy, a listing of the ManorCare administrative team, room rate fee schedule and Voluntary Arbitration Agreement. (**See** Trial Court Opinion, 4/07/20, at 4-5).

[4] Prospect CCMC, LLC d/b/a Crozer-Chester Medical Center and CKHS, Inc. a/k/a Crozer-Keystone Health System, were also defendants in the suit. However, they were not parties to the Preliminary Objections and are not participants in this appeal.

**A.**

Nicole Zimmerman, the ManorCare admissions director, was deposed on January 14, 2019. (*See* N.T. Nicole Zimmerman Deposition, 1/14/19, at 12). Ms. Zimmerman testified that she signed Mr. Lovett in on the date of his admission, February 13, 2016. (*See id.* at 11). She explained that the facility's policy is that admission paperwork be completed within twenty-four to forty-eight hours after a patient is admitted unless the resident refuses to sign or the responsible party is unavailable. (*See id.* at 47-49). The admissions coordinator, Lisa Leggett, would typically get the admissions documents signed by the patient or would attempt to locate the responsible party the patient designated, although sometimes Ms. Zimmerman did it. (*See id.* at 53-54, 70). Ms. Zimmerman was not sure whether she or Ms. Leggett met with Mr. Lovett for the initial attempt to get the admissions paperwork signed, but she testified that both women would have explained, whether it be to Mr. Lovett or any other admitting patient:

> You are going to get some admission paperwork signed, permission for … you to be here, permission for us to take care of you, bill your insurance, there's some additional addendums, there's the arbitration agreement, transportation, and we go through your insurance.

(*Id.* at 122-23); (*see id.* at 120). Mr. Lovett would not have been specifically told that, by voluntarily signing the Agreement, he would be waiving his right to a jury trial. (*See id.* at 123, 136-37). If a resident refused to sign or preferred to have someone else sign on his behalf, Ms. Leggett would

document the date and time of this information in the individual's file. (***See id.*** at 50, 113-15).

Ms. Zimmerman could not remember whether she or Ms. Leggett had met with Mr. Lovett when he told one of them that they would have to speak to his wife about signing the admission documents. (***See id.*** at 111-12, 120). At the time of her deposition, Ms. Zimmerman could not remember seeing file notations about Mr. Lovett's refusal to sign, his designation of his wife as his agent or Ms. Leggett's attempts to reach Ms. Lovett. (***See id.*** at 112-14). In fact, despite the Estate's requests, ManorCare did not produce any such documentation relative to Mr. Lovett, so no such evidence is in the record. (***See*** Supplemental Arbitration-Related Request for Production of Documents, 1/15/19, at 1; Follow-Up Correspondence Requesting Response, 7/25/19, at 1).

On the morning of March 4, 2016, the day of his discharge, when Ms. Zimmerman went to Mr. Lovett's room for the first time that day, Mr. Lovett was sitting up in bed, alone in his room. (***See*** Zimmerman Deposition, at 120). She did not ask Mr. Lovett to sign the documents because it was clear that his wife was to do so. Although she repeatedly testified that Mr. Lovett said his wife was to sign all admission documents, she also testified that Ms. Lovett was to sign because, although Mr. Lovett did not have dementia, he was older than his wife was and had multiple medical issues. (***See id.*** at 120, 140-41).

Ms. Zimmerman returned to Mr. Lovett's room later, between 11:00 A.M. and 1:30 P.M., and he was still in the bed and his wife was standing to the side of him. (*See id.* at 124). Ms. Lovett would have been expecting the documents because Ms. Leggett had arranged for her to be there to sign them. (*See id.* at 129). Ms. Zimmerman introduced herself to Ms. Lovett and told her she was there to get the admissions paperwork signed. (*See id.* at 121, 124). She said that she did not ask for Mr. Lovett's consent at that time and he did not give it. (*See id.* at 122, 127-28). She was not aware of any power of attorney giving Ms. Lovett legal authority to sign the documents. (*See id.* at 125).

She testified that she pulled up a bedside table to go through the paperwork with Ms. Lovett and that the entire process took approximately ten to fifteen minutes. (*See id.* at 121, 125, 132). Ms. Zimmerman pointed out to Ms. Lovett where the documents were marked with an "X" for her to sign as the responsible party. (*See id.* at 132-34). When asked what she told Ms. Lovett about the Agreement, Ms. Zimmerman replied:

> What I tell everybody. It's voluntary. You have the right to change your mind within 30 days. You just have to do so in writing, and we will attach it to the arbitration agreement.
>
> It is a faster process in the event of a lawsuit. You would be able to bring an attorney. The attorneys would pick three arbitrators. The lead arbitrator is a retired Pennsylvania judge. The other two arbitrators have to have at least ten years practicing law experience. They will hear both sides. They will come up with a determination in the case.

(*Id.* at 135).

She did not confirm with Mr. Lovett that his wife had the right to sign the Agreement and waive his right to a jury trial or explain to Ms. Lovett "she was waiving his right to a jury trial by signing it." (**Id.** at 138); (**see id.** at 136). Ms. Lovett did not ask any questions about the Agreement or any of the other documents. (**See id.** at 129, 136). Ms. Zimmerman testified that she could not remember if Mr. Lovett was awake and facing toward them at the time. (**See id.** at 126, 128-29, 138).

**B.**

Hattie D. Lovett was deposed on January 29, 2019. At her deposition, she testified that she and McKinley C. Lovett had been married for thirty-four years, during which time Mr. Lovett usually handled the household bills and wrote the checks for their rent. (**See** N.T. Hattie D. Lovett Deposition, 1/29/19, at 10, 18). Ms. Lovett produced a Wachovia Bank Durable Power of Attorney executed by her husband in her favor dated January 19, 2008. The document authorized certain conduct by her on behalf of her husband involving banking matters at Wachovia Bank only. The document did not authorize any other legal action by Hattie D. Lovett on behalf of her husband for any purpose. (**See id.** at 19) (testifying that the Power of Attorney authorized Ms. Lovett to "cash checks, withdraw[] [and] deposit."); (**see also** Wachovia Bank, N.A. Durable Power of Attorney, 1/19/08, at 1). She started paying rent and other household bills after Mr. Lovett got sick. (**See** N.T. Lovett Deposition, at 18).

Regarding her husband's ManorCare stay, Ms. Lovett testified that she visited him every day for several hours and that, although the staff would speak with her, she was never asked to sign Mr. Lovett's paperwork until March 4, 2016, the day of his discharge. (*See id.* at 42-44, 46-47). Contrary to Ms. Zimmerman's testimony, Ms. Lovett explained that on that day, Mr. Lovett was in a wheelchair on one side of the bed waiting to go home, she was sitting in a chair on the other side of the bed, and his sister was in the room, when a woman came into the room and said, "These are discharge papers. She had her hand where [Ms. Lovett] was to sign, sign and sign and that's what [she] did." (*Id.* at 52); (*see id.* at 17, 30, 31, 33, 53). The woman did not show the papers to Mr. Lovett or ask him to sign them, and Mr. Lovett never asked Ms. Lovett to sign the paperwork on his behalf. (*See id.* at 24-25, 33, 50-51, 53). The woman had the pages ready where she was to sign, so she did so, but she did not read the paperwork packet. (*See id.* at 34-35, 37, 39). She "thought [she] was doing the right thing," because she felt that she had to sign the documents before Mr. Lovett could leave. (*Id.* at 53); (*see also* 52-54). According to Ms. Lovett, the woman did not explain that the paperwork contained a Voluntary Arbitration Agreement or mention anything about a jury trial or giving up the right to a jury trial. (*See id.* at 53-54). She did not advise her that signing the Agreement was voluntary or ask if Ms. Lovett had a power of attorney for her husband. (*See id.* at 51, 54).

**C.**

Lovett and ManorCare each filed a supplemental memorandum of law on September 4, 2019, and September 5, 2019, respectively. After its thorough review of the memoranda and exhibits attached thereto, the court overruled ManorCare's request that it enforce the Agreement, finding that Ms. Lovett lacked authority to sign it where "the record fails to establish that the late McKinley C. Lovett was requested to sign any of the admission papers, that the Voluntary Arbitration Agreement was presented or discussed with Mr. Lovett or that he was aware of the execution of the documents at discharge." (**Id.** at 6). ManorCare timely appealed[5] and it and the court have complied with Rule 1925. **See** Pa.R.A.P. 1925.

**II.**

In this appeal, ManorCare argues that "the trial court erred in refusing to enforce the agreement requiring arbitration of disputes by finding that

---

[5] "Our [standard of] review of a claim that the trial court improperly denied the appellant's preliminary objections in the nature of a petition to compel arbitration is limited to determining whether the trial court's findings are supported by substantial evidence and whether the trial court abused its discretion in denying the petition." **Wisler v. Manor Care of Lancaster PA, LLC**, 124 A.3d 317, 322 (Pa. Super. 2015), *appeal denied*, 128 A.3d 222 (Pa. 2015) (citation omitted). "We employ a two-part test to determine whether the trial court should have compelled arbitration: 1) whether a valid agreement to arbitrate exists, and 2) whether the dispute is within the scope of the agreement." **Washburn v. Northern Health Facilities, Inc.**, 121 A.3d 1008, 1012 (Pa. Super. 2015), *appeal denied*, 167 A.3d 702 (Pa. 2017) (citations omitted). "Our scope of review is plenary." **Wisler**, **supra** at 322 (citation omitted).

Hattie Lovett did not have the requisite authority to execute the agreement on behalf of her husband, McKinley Lovett[.]" (ManorCare's Brief, at 3). It argues that the trial court failed to acknowledge that both the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-307, and Pennsylvania precedent "reflect a liberal policy favoring arbitration of disputes." (*Id.* at 12-16). It also argues that Ms. Lovett had the express and apparent authority to sign the Agreement on Mr. Lovett's behalf and she is estopped from denying agency. (*See id.* at 17-25).

**A.**

As a preliminary matter, we address ManorCare's general argument that the trial court's opinion did not recognize and apply the liberal policy favoring arbitration established by the FAA. As noted by this Court in *MacPherson v. Magee Memorial Hosp. for Convalescence*, 128 A.3d 1209 (Pa. Super. 2015), *appeal denied*, 161 A.3d 789 (Pa. 2016), *cert. dismissed*, 138 S.Ct. 354 (2017):

> Pennsylvania has a well-established public policy that favors arbitration, and this policy aligns with the federal approach expressed in the FAA. The fundamental purpose of the FAA is to relieve the parties from expensive litigation and to help ease the current congestion of court calendars. Its passage was a congressional declaration of a liberal federal policy favoring arbitration agreements.

*MacPherson*, *supra* at 1219 (citation and brackets omitted). "This policy applies equally to all arbitration agreements, including those involving nursing homes." *Id.* (citations omitted). The FAA puts arbitration "agreements upon

- 11 -

the same footing as other contracts." ***Salley v. Option One Mortg. Corp.***, 925 A.2d 115, 119 (Pa. 2007) (citation omitted). Thus, "when addressing the specific issue of whether there is a valid agreement to arbitrate, courts generally should apply ordinary state-law principles that govern the formation of contracts, but in doing so, must give due regard to the federal policy favoring arbitration." ***MacPherson***, ***supra*** at 1219 (citation omitted). However, while there is a policy that favors arbitration, whether a person has the authority under agency principles to bind the third party and the scope of that authority affects the validity of the contract. In this case, the issue is whether the trial court erred when it concluded that Ms. Lovett lacked the authority to sign the Agreement.

**B.**

ManorCare maintains that the trial court erred when it found that Ms. Lovett lacked either the actual or apparent authority or authority by estoppel.

Even if a party did not sign an arbitration agreement, he may be compelled to arbitrate under such agreement, based on common law principles of agency and contract. ***See Wisler***, ***supra*** at 323. The party asserting agency has the burden of establishing an agency relationship. ***See id.*** The agency relationship is one in which "the principal manifests assent that another person (the agent) will act on the principal's behalf subject to the principal's control, and the agent agrees to do so." ***Id.*** (citation omitted).

"The basic elements of agency are the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." **Walton v. Johnson**, 66 A.3d 782, 787 (Pa. Super. 2013) (citation omitted). "An agency relationship may be created by any of the following: (1) express authority, (2) implied authority, (3) apparent authority, and/or (4) authority by estoppel." **Washburn**, **supra** at 1012 (citations omitted).

**1.**

ManorCare's first argument is that Ms. Lovett had Mr. Lovett's actual or express authority to sign the Agreement as part of the admissions paperwork. (**See** ManorCare's Brief, at 17-18).

"Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters. … A valid, durable power of attorney constitutes a grant of express authority per its terms." **Wisler**, **supra** at 323-24 (citations omitted). "A party who deals with an agent must take notice of the nature and extent of the authority conferred. Parties are bound at their own peril to notice limitations upon the grant of authority before them[.]" **Id.** at 324 (citation omitted). "The authority to consent to medical treatment and care on behalf of a principal does not necessarily entail the authority to consent to arbitration," particularly

when the arbitration agreement is not a condition of admission. ***Id.*** (citation omitted).

Here, we first note that it is undisputed that Ms. Lovett was not her husband's legal guardian, and although Mr. Lovett provided his wife with a Wachovia Bank Limited Power of Attorney, it did not grant her authority outside of handling banking matters. Although ManorCare argues that granting Ms. Lovett with the Wachovia Bank Power of Attorney establishes a course of conduct, we find such argument unavailing for express/actual authority, which requires that Mr. Lovett "deliberately and specifically grant[ed] authority" to Ms. Lovett to sign the Agreement. ***Id.*** at 323 (citation omitted).

Further, despite ManorCare's argument that "[t]he record is undisputed that during the three-week admission, Mr. Lovett instructed admissions staff to go over the admissions paperwork with his wife[,]" there is no actual evidence of same. (ManorCare's Brief, at 17). Although Ms. Zimmerman testified that Mr. Lovett said that Ms. Lovett had the authority to sign all paperwork on his behalf, and that she would expect this to be documented, ManorCare provided no evidence of such actual grant of authority, in spite of numerous requests for the documentation and it being ManorCare policy that any such actual grant of authority would be noted in writing. Ms. Zimmerman could not remember specifically when Mr. Lovett said that he was granting his

wife with this authority and whether it was told to her or her colleague, Ms. Leggett.

More importantly, there was no evidence that Mr. Lovett granted his wife with the specific authority to sign the Agreement and waive his constitutional right to a jury trial. Ms. Zimmerman explained that either she or her colleague would have mentioned the Agreement to him but would not have said anything "about waiving the right to a jury trial" or anything of that nature. (Zimmerman Deposition, at 123, 136-37). At the time of signing, Ms. Zimmerman did not question whether Ms. Lovett had a power of attorney or was the legal guardian for Mr. Lovett or ask Mr. Lovett, who was in the room at the time, if his wife had the authority to sign the Agreement. Ms. Zimmerman was uncertain if he was even awake or facing toward them at the time, did not explain to Ms. Lovett "she was waiving his right to a jury trial by signing" or confirm with Mr. Lovett that his wife had the authority to sign this legal document. (*Id.* at 138). Ms. Lovett testified that her husband did not tell her to sign any of the admissions documents.

Based on the foregoing, we discern no abuse of discretion in the trial court's finding that ManorCare failed to prove that Mr. Lovett granted Ms. Lovett with the actual authority to bind him to the Agreement. **See Wisler**, **supra** at 324 (even if son had power of attorney granting him ability to sign admissions paperwork on father's behalf, where it did not indicate that it also allowed him to waive litigation rights in favor of arbitration, son lacked actual

authority to sign arbitration agreement); *see Washburn*, *supra* at 1014-15 (concluding wife was not husband's agent, despite her having previously signed and filed joint tax returns and healthcare forms on her husband's behalf, because there was no evidence that husband had authorized her to sign arbitration agreement specifically).

**2.**

Next, we turn to ManorCare's claim that Ms. Lovett had the apparent authority to sign the Agreement on her husband's behalf. (*See* ManorCare's Brief, at 18-20).

> Apparent agency exists where the principal, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has granted the agent authority to act. An agent cannot simply[,] by his own words, invest himself with apparent authority. Such authority emanates from the action of the principal and not the agent.

*Wisler*, *supra* at 324 (citations omitted).

ManorCare argues that "Mr. Lovett's insistence to Ms. Zimmerman that [his wife] sign the admission documents, including the Arbitration Agreement, on his behalf, paired with him looking on as she reviewed them with Ms. Zimmerman is clear and un-contradicted evidence of apparent authority." (ManorCare's Brief, at 18). It also maintains that the Wachovia Bank Power of Attorney "provide[s] evidence that Mr. Lovett was increasingly willing to authorize her to manage his affairs," and she took on additional tasks such as paying bills and their apartment's lease. (*Id.* at 19).

We first observe that we addressed ManorCare's claim that Mr. Lovett expressly told Ms. Zimmerman that he wanted his wife to sign the admissions paperwork, including the Agreement, on his behalf when we reviewed his claim of actual agency, and we concluded the evidence failed to establish that he expressly intended to grant such authority. (*See* Memorandum, supra at 14-15). Moreover, we observe that this was Mr. Lovett's first admission to ManorCare. Thus, he did not have a prior course of conduct of granting his wife with the authority to sign arbitration agreements and to waive his right to a jury trial in previous admissions. Hence, we conclude that ManorCare has failed to establish Mr. Lovett's alleged course of conduct on this basis.

Furthermore, ManorCare's claim that Mr. Lovett's conduct in "look[ing] on as [his wife] reviewed [the Arbitration Agreement] with Ms. Zimmerman," thus establishing her apparent authority, is belied by the record. Indeed, Ms. Zimmerman was unsure if Mr. Lovett was even awake as she went over the admissions paperwork, including the Agreement, with his wife. Therefore, merely because Mr. Lovett was in the room when the Agreement was signed does not establish Ms. Lovett with the apparent authority to sign it.

Finally, we do not find persuasive ManorCare's suggestion that the Wachovia Bank Power of Attorney established Mr. Lovett's course of conduct in granting Ms. Lovett more authority to make decisions on his behalf and, therefore, provided her with apparent authority to sign the Agreement. Instead, it demonstrates that Mr. Lovett was aware that he could grant his

wife with a power of attorney and he chose to grant her with the limited authority to make banking decisions, yet he chose not to grant her a power of attorney to sign legal documents such as the Agreement.

Based on the foregoing, it is not even clear that Mr. Lovett was awake or aware that Ms. Lovett was signing the Agreement and voluntarily waiving his right to a jury trial. Moreover, he exhibited no course of conduct in granting Ms. Lovett with legal authority to sign an arbitration agreement on his behalf where this was his first admission to ManorCare and he had elected not to grant her with a legal power of attorney. Therefore, there was nothing in his actions that would lead a person to believe that he granted Ms. Lovett the apparent authority to sign the Agreement on his behalf. **See Wisler**, **supra** at 324 (affirming trial court conclusion that son, who had signed paperwork for two different nursing home admissions, paid father's bills and handled his banking, lacked apparent authority to sign arbitration agreement where no one confirmed with father that son's authority extended to signing agreement); **Washburn**, **supra** at 1015 (wife lacked apparent authority to sign arbitration agreement in part because no course of conduct in doing so where no prior dealings with facility). Accordingly, the trial court properly found that ManorCare failed to establish apparent authority.

## C.

In its final agency argument, ManorCare maintains, "Ms. Lovett is estopped from denying that she had the authority to sign the Arbitration

Agreement on her husband's behalf." (ManorCare's Brief, at 20). ManorCare argues that Mr. Lovett was present when Ms. Zimmerman and Ms. Lovett were going through the admissions paperwork and he did nothing to suggest his wife lacked authority. (*See id.* at 21). Ms. Lovett is a competent adult who signed the Agreement of her own volition. Her failure to read it prior to signing does not undermine the validity and enforceability of the contract. (*See id.* at 24-25).

The Estate responds, "there is no evidence that Mr. Lovett knew or should have known that his wife executed an arbitration agreement. As such, Mr. Lovett could not possibly be negligent for failing to repudiate his wife's actions." (Estate's Brief, at 34) (internal quotation marks omitted).

> Agency by estoppel … is essentially a determination of agency by after-the-fact actions by the principal. Agency by estoppel contains the elements that the principal intentionally or carelessly caused a third party to believe an agency relationship existed, or knowing that the third party held such a belief, did not take reasonable steps to clarify the facts. Additionally, there must be justifiable reliance by the third party.

*Walton*, *supra* at 788 (citations omitted).

We find *Washburn*, *supra*, instructive. In *Washburn*, Mr. Washburn had dementia and lacked the capacity to execute the arbitration agreement. Ms. Washburn signed the admissions paperwork, including the arbitration agreement as the designated legal representative for healthcare and financial decisions, but she did not have her husband's power of attorney and she had not been appointed his guardian, which she communicated to the nursing

facility's employee. The arbitration agreement was one in a series of documents presented to Ms. Washburn; she believed she was signing documents authorizing the hospital to treat her husband. In the past, Ms. Washburn had electronically signed their joint tax returns on her decedent husband's behalf. She also completed his application for Medicaid benefits and a "Do not Resuscitate" form. *See Washburn*, *supra* at 1010-11.

After concluding that the defendant facility had failed to prove actual and apparent agency, the *Washburn* Court found that agency by estoppel did not apply either because:

> decedent [had not] availed himself of the [arbitration] agreement or received any benefit under that agreement. The [] agreement was separate from the admission agreement and admission was not conditioned upon agreeing to arbitrate. Thus, the agreement to arbitrate was not part of the contractual *quid pro quo* for admission to the facility and its attendant benefits.

*Washburn*, *supra* at 1015-16.

Similarly, here, the Agreement expressly stated that admission was not contingent on the Agreement being signed, so Mr. Lovett realized no benefit from his wife signing it.[6] Moreover, there is no evidence that he ratified the Agreement after Ms. Lovett signed. Therefore, we conclude that ManorCare has failed to establish agency by estoppel.

---

[6] We briefly note that even if the Agreement was **not** separate from the admission agreement and admission **was** conditioned upon agreeing to arbitrate, it is unlikely that Mr. Lovett could have realized any benefit by Ms. Lovett signing it where she did so at the time of his discharge.

Accordingly, putting the Agreement "upon the same footing as other contracts[,]" and "apply[ing] ordinary state-law principles that govern [their] formation," while giving "due regard to the federal policy favoring arbitration," we conclude that the trial court properly denied ManorCare's motion to enforce the Agreement because no valid contract was formed where Ms. Lovett lacked the authority to sign it on her husband's behalf.[7] *MacPherson*, *supra* at 1219 (citation omitted); *Salley*, *supra* at 119 (citation omitted); *see Wisler*, *supra* at 322.[8]

Order affirmed.

---

[7] We do not find ManorCare's reliance on *Del Ciotta v. Pennsylvania Hosp. of the Univ. of Penn Health System*, 177 A.3d 335 (Pa. Super. 2017), to be legally persuasive because it is factually distinguishable. (*See* ManorCare's Reply Brief, at 6-7). In *Del Ciotta*, this Court affirmed a trial court's order enforcing an arbitration agreement based on the signatory son's verified (subject to criminal penalties) pleading that admitted he was authorized to sign his father's admissions paperwork as his personal representative due to his father's incapacity, as well as other documentary evidence supporting the authority. *See Del Ciotta*, *supra* at 355. Here, there is no such verified statement or other documentary evidence establishing that Mr. Lovett gave Ms. Lovett the authority to sign the Agreement.

[8] Because we conclude that no valid contract was formed and the trial court did not address these arguments, we decline to reach the Estate's alternate claims about material representation, the Agreement's scope and bifurcation. (*See* Estate's Brief, at 35-45).

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 11/18/2020*